1
2
3
4                    **UNITED STATES DISTRICT COURT**
5                        **DISTRICT OF NEVADA**
6
7   JANINE GRONEMAN,                        )
                                            )
8               Plaintiff,                  )   Case No.  2:12-cv-1839-APG-GWF
                                            )
9   vs.                                     )   **FINDINGS AND**
                                            )   **RECOMMENDATION**
10  CAROYN W. COLVIN, Acting Commissioner,  )
    Social Security Administration,         )
11                                          )
                                            )
12              Defendant.                  )
    _____)
13          This matter is before the Court on Plaintiff Janine Groneman's Complaint for Review of

14  Final Decision of the Commissioner of Social Security (#3), filed on October 26, 2012 which

15  denied her application of social security disability benefits.  The Acting Commissioner filed her

16  Answer (#14) on March 4, 2013.  Plaintiff filed her Motion for Reversal and Remand (#20) on May

17  31, 2013.  The Acting Commissioner filed her Cross-Motion to Affirm and Opposition to

18  Plaintiff's Motion for Reversal (#21) on June 28, 2013.  No reply brief was filed.

19                              **BACKGROUND**

20       **A.      Procedural History.**

21          Plaintiff filed an application for a period of disability, disability insurance benefits and

22  supplemental social security income on April 8, 2009, alleging that she became disabled beginning

23  April 27, 2007.  AR 125-131.  The Commissioner denied Plaintiff's application initially on

24  November 17, 2009, and upon reconsideration on May 17, 2010.  AR 76-79; 83-85.  Plaintiff

25  requested a hearing before an Administrative Law Judge (ALJ).  AR 86-87.  The hearing was

26  conducted on April 21, 2011 at which Plaintiff appeared and testified.  AR 44-73.  The ALJ issued

27  his decision on July 29, 2011 and concluded that Plaintiff was not disabled from April 27, 2007

28  through the date of the decision.  AR 23-28.  Plaintiff's request for  review by the Appeals Council

1   was denied on August 29, 2012.  AR 1-4.  Plaintiff then commenced this action for judicial review

2   pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned magistrate judge

3   for a report of findings and recommendations pursuant to 28 U.S.C. §§ 636 (b)(1)(B) and (C).

4       **B.      Factual Background.**

5          **1.      Written Disability Report and Function Reports**
                    **Completed by Ms. Groneman and her Husband.**

6

7       Plaintiff Janine Groneman was born on March 21, 1953.  AR 134.  She has a twelfth grade

8   education.  AR 69.  Plaintiff is married to Marvin Groneman.  She has adult children from a prior

9   marriage(s).

10      Plaintiff alleges that she became disabled on or about April 27, 2007.  In a Disability Report

11  form completed on May 14, 2009, Ms. Groneman stated that she was disabled due to bi-polar

12  disorder and that the medication she takes for this illness make it impossible for her to work.  AR

13  146.  She amplified this statement in the "Remarks" section as follows: "lack of sleep, unable to

14  concentrate, loss of memory or excessive sleepiness."  AR 153.  She also stated that the bi-polar

15  disorder causes her to experience mania and depression.  Id.  Ms. Groneman reported that this

16  illness began in approximately 1979, but was mis-diagnosed as depression and the treatment

17  aggravated the disorder and made her condition worse.  AR 146, 153.  Ms. Groneman stated that

18  she stopped working in September 2007 because she could not concentrate, experienced loss of

19  memory and alternatively could not get enough sleep or experienced excessive sleeping.  AR 146.

20      Ms. Groneman identified the doctors and therapists who treated her bi-polar disorder and

21  the medications prescribed to her.  AR 148-149, 151, 153.  Although Plaintiff had undergone brain

22  surgery in September 2007 for removal of a right posterior meningioma (tumor), she did not refer

23  to the tumor or the brain surgery as a basis for her claim of disability in her May 14, 2009

24  Disability Report.  Nor did she list the doctors or other medical providers who diagnosed and

25  treated that condition.  AR 146-154.

26      Ms. Groneman reported that she worked as the office manager for a chiropractic clinic from

27  May 2004 to April 2007.  She briefly resumed employment as a "medical biller" from June to

28  September 2007.  AR 147, 186-191.  She previously worked as a medical records clerk in 2003.

From 1998 to 2001 she was employed in a finance company, and from 1995 to 1998 she worked as a patient coordinator in a medical business.  Id.

Ms. Groneman completed a Function Report on July 12, 2009.  AR 194-201.  In that report, she described her typical day as follows:

> That depends on how I feel each day.  My medications are sometimes too intense to do anything.  Sometimes there are residual effects from my meds.  Sometimes there are routine things that I do on some days.  Sometimes I don't do anything at all due to residual effects of meds.  I get up, sometimes make the bed, sometimes do dishes, eat breakfast or lunch, watch TV.  Sometimes make dinner and go to bed.

AR 194.

Ms. Groneman stated that she was no longer able to work or clean her house.  She also stated that her motor vehicle driving was limited and she was not active.  AR 195.  She stated that the bi-polar disorder had adversely affected her ability to sleep for many years.  Id.  She reported no problem with her personal care and did not need any special reminders to take care of personal needs or grooming.  She did, however, need reminders to take medication and indicated that her husband monitors this.  AR 195-196.  Ms. Groneman stated that she sometimes makes dinner, mostly frozen dinners.  She was able to do dishes and laundry.  Her husband assisted her and they cleaned together.  AR 196.  She stated that she shopped for groceries twice a week--about one hour each time.  She was able to pay bills, count change, handle a savings account and use a checkbook or money orders.  AR 197.  She listed her hobbies and interests as reading, watching TV and playing with her dogs.  She stated that she read when she was in the mood, and watched TV and played with her dogs on a daily basis.  AR 198.  Ms. Groneman stated that she visited and talked on the phone with family members.  She indicated that she sometimes needed someone to accompany her on trips away from home.  Id.  She reported no problems in getting along with family, friends or neighbors.  AR 199.

Ms. Groneman stated that her illness affected her ability to complete tasks, concentrate, understand and follow instructions.  AR 199.  Her ability to pay attention varied.  She was able to finish what she started most of the time.   She had no problems in following written instructions, but it took her two to three times to read and understand them clearly.  She was able to follow

3

spoken instructions.  AR 199.  She stated that she was able to get along with authority figures and had never been fired from a job because of difficulty in getting along with other people.  She stated, however, that she did not handle stress or changes in routine well.  AR 200.

Ms. Groneman's husband, Marvin Groneman, completed a third party Function Report.  AR 178-185.  His responses to the questions on the form were generally consistent with his wife's.  He reported that her daily activities "depend[] on the leftover effects from her sleeping medication."  AR 178.  He stated that she could not sleep without medications and needed reminders to take her medications.  AR 179-180.  Mr. Groneman indicated that his wife was able to pay bills, count change, handle a savings account and use a checkbook or money order.  He commented, however that "[m]oney is a persons (sic) with Bi Polar Disorder worst enemy."  He stated that money is doled out and not left accessible.  AR 181-182.

The Social Security Administration (SSA) denied Ms. Groneman's claim on November 17, 2009 on the ground that her condition was not severe enough to be considered disabling.  AR 76.  The Notice of Disapproved Claim stated in part:

> You said you are disabled because of bipolar disorder/mental illness.
>
> The medical evidence shows your condition is not at a severity level that would be considered disabling.  Although you may experience problems at times, your overall condition is not severe enough to preclude all work.  Therefore, disability is not established.

AR 76.

Following this denial, Ms. Groneman retained counsel and requested reconsideration of her application.  In its May 17, 2010 denial on reconsideration, the SSA stated:

> You said you are disabled due to mental illness, bipolar disorder, gastroparesis and brain tumor surgery in 2007.
>
> The medical evidence shows that although you may be depressed at times, you are able to think, communicate and act in your own best interest.  You have recovered well from your brain tumor surgery.  We have found no other disabling condition in our review of your claim.

AR 83.

. . .
. . .
. . .

4

2.      **Medical Records and Opinions.**

**(a) Sean Duffy, M.D.**  Sean Duffy, M.D., psychiatrist, initially saw Ms. Groneman on June 19, 2006.  Dr. Duffy stated that Ms. Groneman was referred to him by her husband.  AR 324.  Ms. Groneman told Dr. Duffy that she had a long standing pattern of mood swings dating back decades. She reported that a typical pattern would be that every six to nine months she would have a decreased need for sleep, and would get by on just an hour or two of sleep at night.  During these periods she was irritable, became impulsive and hypersexual, which led to affairs and problems in her marriages.  These manic episodes would be followed by a low period in which she felt distraught and hopeless.  Ms. Groneman reported no history of past psychiatric hospitalization or psychiatric treatment.  Dr. Duffy noted: "Currently her mood actually is reasonably euthymic, having recently been in a major mood swing, so she may have a rapid cycling variant of bipolar since her mood is actually much improved today, having been depressed as recently as Sunday, or this past weekend."  AR 324.  Dr. Duffy stated that "based on her pattern of very poor decision making in the past, [she] most likely has had full blown manic episodes, therefore I am going to describe this as bipolar disorder type I."  AR 325.  Dr. Duffy discontinued Ms. Groneman on Wellbutrin and Lunestra medications, the latter of which was not working for her insomnia.  He prescribed Serquel for sleep and lithium carbonate to stabilize her mood.  Dr. Duffy stated that Ms. Groneman and her husband were going to seek a counselor with knowledge of bipolar disorders. Dr. Duffy's diagnosis under Axis I was "Bipolar I disorder, most recent episode mixed, partially in remission."  Under Axis V, he gave Ms. Groneman a global assessment of functioning (GAF) score of 55.  AR 325.

Ms. Groneman reported to Dr. Duffy on June 29, 2006 that she was sleeping well on 50 mg Serquel and requested a prescription for that strength.  AR 326.  On July 14, 2006, she reported that she was not doing well with her mood.  Id.  On July 18, 2006, she reported that she was easily irritable or agitated, was feeling down in the dumps a lot, was crying, could not concentrate, was tired and had trouble remembering things.  AR 326.  She reported some tremor and nausea.  She stated, however, that the Serquel had done a good job for her insomnia.  Dr. Duffy indicated that he would alter the medications to deal with her mood problems.  Id.

Dr. Duffy next saw Ms. Groneman on August 29, 2006. She indicated that the lamictal medication might be starting to help her mood. She stated that her employer had commented that her performance had not been as good as in the past, possibly placing her job at risk. AR 327. On September 26, 2006, Ms. Groneman reported that her mood was much better. She assumed she was doing better at work because she had not received any negative feedback. AR 327. Dr. Duffy's assessment was that Ms. Groneman was "[n]ot quite baseline, but much better." Id.

On November 14, 2006, Ms. Groneman reported having persistent tremor and upset stomach four months into the lithium trial. She was experiencing continued variability in mood swings and was seeing Dr. DiOrio every two weeks. Ms. Groneman stated that she was not sleeping as well as she would like, due in part to her husband's snoring. Dr. Duffy decided to "give up" on the lithium because it was not holding her mood steady and was having too much side effects. AR 328. On December 19, 2006, Ms. Groneman reported that she was feeling better and her mood was improved with the increase in lamictal medication. She reported, however, that she was not sleeping well and needed an increase in Serquel. Dr. Duffy increased the Serquel dosage from 50 mg to 100 mg. AR 328.

On February 20, 2007, Ms. Groneman reported that she had moved out of the house due to her husband's son being there. She had seen a divorce lawyer, but was not really serious about filing for divorce. Dr. Duffy noted that her husband accompanied her to the appointment. Ms. Groneman reported difficulty with concentration and decision making. She felt a bit out of control and stated that she felt scattered when driving. She also stated that in the past two weeks she was "having emergent sleep problems with middle insomnia lasting a couple hours." Dr. Duffy prescribed a new mood stabilizer medication. AR 329.

On March 20, 2007, Ms. Groneman reported that she had moved back home and things had settled down somewhat. She reported that her sleep patterns were okay and she had no complaints from her employer. Dr. Duffy's assessment was that Ms. Groneman was doing better for now and he scheduled her for follow-up in three months. AR 329. On June 15, 2007, Dr. Duffy's office received a phone call from Ms. Groneman stating that she was cancelling her appointment and would not be returning for treatment. Dr. Duffy attempted to contact Ms. Groneman, but was

6

unable to reach her.  The note indicates that Dr. Duffy spoke to her husband, but the record

regarding that conversation is incomplete. AR 329.

**(b)  Robert J. DiOrio, Ph.D.**  Dr. Robert J DiOrio, a psychologist, submitted an August 24,

2010 letter addressed to Social Security Disability.  Dr. DiOrio stated that Ms. Groneman initiated

out-patient psychotherapy with his agency on February 3, 2005 and was transferred to his care on

June 22, 2006 to determine if a diagnosis of bipolar disorder was accurate.  Dr. DiOrio stated that

Ms. Groneman presented with a lengthy history of episodes of mania and depression which were

dramatically affecting her ability to retain employment or consistently maintain performance

standards on the job.  Her disorder was also causing significant conflicts in her marriage.  Dr.

DiOrio stated that he referred Ms. Groneman to Dr. Duffy.  (This in inconsistent with Dr. Duffy's

June 19, 2006 report.)  Dr. DiOrio further stated:

> She remained in treatment with me for approximately one year and
> eventually discontinued treatment with me while maintaining her
> medical contact and treatment context.  Her ability to work full or
> part-time is significantly impaired to warrant a full disability
> evaluation; given history I would support a finding of permanent
> disability.

AR 506.

No contemporaneous treatment or therapy notes from Dr. DiOrio are contained in the

record.

**(c)  St. Rose Dominican Hospital (Brain Tumor and Surgery).**[1]  Ms. Groneman was seen

in the hospital emergency room on August 19, 2007, at which time she reported repeated vomiting

for about 3-4 days.  AR 402.  She was prescribed medication and told to return if her symptoms

worsened.  AR 403.  Ms. Groneman returned to the emergency room on  September 10, 2007.  AR

392.  She reported that she had been unable to eat for the past three weeks and was suffering from

intractable nausea with a couple episodes of vomiting.  Ms. Groneman was dehydrated and reported

that she had not been able to take her chronic bipolar medications.  Id.  Ms. Groneman was

---

[1] Most of the hospital records do not contain the name of the facility.  *See e.g.* AR 392-443.
However, Dr. James Forage's operative report and certain x-ray reports in the record identify the
facility as St. Rose Dominican Hospital.

1   admitted to the hospital to assess and treat her severe symptoms.  A brain MRI was obtained during

2   this hospitalization which revealed a large right posterior fossa consistent with a meningioma.  Ms.

3   Groneman underwent surgery on September 17, 2007 by Dr. James Forage, M.D. to remove the

4   meningioma.  AR 400.  According to the October 11, 2007 discharge summary, her post-surgical

5   course was not complicated.  Her nausea and vomiting resolved and she was discharged home in

6   stable condition.  AR 400.  Dr. Forage saw Ms. Groneman in follow-up on October 25, 2007.  He

7   reported that Ms. Groneman was doing well, but that she complained of being tired and having

8   some nausea.  AR 454.  Dr. Forage saw her again on December 11, 2007.  He again noted that she

9   was doing well, but did have persistent nausea.  Dr. Forage stated: "I reviewed her MRI scan of the

10   brain that shows no residual tumor and only a small amount of fluid at the postoperative site."  AR

11   455.  He scheduled her for a follow-up visit and MRI of the brain in one year.  Id.

12       **(d)  Medical Records Regarding Plaintiff's Nausea Symptoms.**  Ms Groneman continued

13   to complain of persistent nausea following the September 2007 brain surgery.  On November 13,

14   2007, Dr. Dipesh Banker of Gastroenterology Center of Nevada stated that he suspected Ms.

15   Groneman's recurrent nausea and vomiting was secondary to gastroparesis. AR 478.  Ms.

16   Groneman was thereafter evaluated by Dr. S. Zhao, a gastroenterologist at Loma Linda University

17   Health Care, on July 21, 2008.  Ms. Groneman reported to Dr. Zhao that she had lost 40 pounds

18   over the past year.   Dr. Zhao's impression was that Ms. Groneman had persistent nausea with

19   dysphagia (difficulty swallowing).  He stated that the differential diagnosis for this symptom

20   included reflux disease, esophageal dysmotility, retained gallstones or medication-induced nausea.

21   He stated that it was unlikely to be an obstruction in nature.   AR 383-384.

22       Ms. Groneman was evaluated by Dr. Bennett E. Roth at the UCLA Medical Center on

23   August 30, 2010.  AR 529-530.  Based on his review of the records, Dr. Roth noted that her

24   persistent nausea, without vomiting, did not resolve by use of various medications.  Ms. Groneman

25   reported that the nausea can be brought on by as little as a small amount of water and that she had

26   lost 30 pounds over the past three years related to her decreased consumption of food.  Ms.

27   Groneman acknowledged that the symptoms can be brought on when she is under stress.  AR 529.

28   Dr. Roth stated that the etiology of the nausea was not clear.  It was not consistent with

gastroparesis because persons with that condition experience progressive nausea and ultimately vomiting as the day goes on and the stomach fills.  Dr. Roth suspected that Ms. Groneman's nausea had either a central nervous system origin with heightened sensitivity of the brain to any forms of stimuli inducing nausea, or that it was a component of emotional issue[s].  AR 530.  He did not believe her current medications were causing the nausea symptoms.  Dr. Roth indicated that the nausea might be helped by Xanax.  He cautioned, however, that Xanax is addictive and could lead to dependency problems.  Id.  Dr. Roth indicated that other medication should be attempted to relieve the nausea.  There is no follow-up medical records as to whether Dr. Roth's recommended treatment plan was pursued and, if so, whether it helped relieve Ms. Groneman's nausea.  She testified at the April 2011 hearing, however, that she was still experiencing nausea every other day or every two days.  AR 57-58.

**(e) Dr. Anuranjan Bist/Oasis Behavioral Health.**  Ms. Groneman treated with Dr. Anuranjan Bist, a psychiatrist, from November 6, 2008 to March 2, 2011.  AR 240-246; AR 292-295; AR 507-528.  Dr. Bist's office visit records include brief and somewhat indecipherable handwritten notes.  His records also contain a printed check list of mental conditions or symptoms, which the physician circles "yes" or "no" as applicable to the patient.  Dr. Bist's November 6, 2008 office note appears to indicate that Ms. Groneman's bipolar condition was currently stable.  AR 527.  His checklist indicated that Plaintiff was alert and well groomed.  Her general movements were not accelerated, decreased, restless or fidgety.  Her mood was not characterized by euphoria, elation, anger, hostility, fear anxiety or depression or sadness.  Her affect was full and appropriate.  Her intellectual functioning was not impaired.  She was oriented to time, place and person.  Her insight and judgment were not impaired.  Her memory was intact.  Her thought content was not characterized by obsessions, compulsions, derealization, depersonalization, suicide ideation, homicidal ideation, delusions, ideas of reference or ideas of influence.  Her thought perception-thought flow was not increased or decreased.  AR 246.

Dr. Bist's January 12, 2009 record indicates that Ms. Groneman was doing okay, but was still nauseous.  There was no change in the checklist items.  AR 245.  He gave her a global assessment of functioning (GAF) score of 65.  AR 524.  On April 6, 2009, Ms. Groneman reported

that her mood was stable, she was sleeping "ok" and was less nauseous.  There was no change in

the checklist items.  AR 242, 521.  On June 10, 2009, Ms. Groneman reported she was doing okay.

There was no change in the checklist items.  AR 241, 519.  On September 9, 2009, her mood was

stable and Dr. Bist appeared to indicate there were less issues.  AR 517.  On December 9, 2009,

Ms. Groneman's mood was stable.  There was no change in the checklist items.  AR 295, 515.

The  March 3, 2010 record indicated that Ms. Groneman had sleep disturbance every two weeks.

The checklist indicated that she was experiencing fear, anxiety and apprehension.  AR 293, 513.

Although Ms. Groneman was scheduled for follow-up in three months, the next office visit record

is dated November 10, 2010.  That record indicates that Ms. Groneman was taking Xanax every

day.  Her mood was good and her sleep was okay.  The checklist did not indicate any adverse

findings or symptoms.  AR 510.  Ms. Groneman was next seen on March 2, 2011.  Dr. Bist's note

indicates that she was still anxious and not sleeping.  The checklist also indicated that she was

experiencing fear, anxiety, apprehension.  AR 507.

   **(f) Kenneth McKay, Ph.D.**  Ms. Groneman was examined by Dr. Kenneth McKay,

psychologist, on October 22, 2009 at the request of the Bureau of Disability Adjudication.  AR 247.

According to Dr. McKay's report, Ms. Groneman stated:

> "I'm Bipolar.  I'm a manic.  I have a tendency of packing up and
> leaving.  I have several other . . . I wrote down all my conditions, but
> that's not the word I'm looking for . . .  I wrote down all my
> symptoms . . . so I wouldn't forget them.  I'm easily distracted, easily
> agitated or irritated.  I have difficulty making decisions, fatigue,
> excessive sleepiness.  I take sleeping pills to sleep at night, and
> sometimes they work, and sometimes they don't.  I have loss of
> appetite, weight loss, unable to concentrate, can't remember things,
> forgetful.  I have confusion and lack of energy."

   AR 247.

   Ms. Groneman stated that during her last employment in the summer of 2007, she was

suffering from an undiagnosed brain tumor that was making her sick all the time and caused her to

miss work.  Her boss told her she was going to have to let her go.  Ms. Groneman stated that she

ended up in the emergency room that same day and was then in the hospital for her brain surgery.

AR 248.  When asked about her ability to work or to attempt to return to work, Ms. Groneman

stated:  "'Well, due to my symptoms, I think it would be hard for me because I can't concentrate.  I

don't remember things.  Sometimes its hard for me to get up in the morning.  The symptoms I gave you earlier, lack of energy.'" AR 248.

Ms. Groneman stated that before she was placed on medication, she was very manic.  AR 249.  The medication had a calming effect on her mood.  She reported fluctuating sleep, reduced appetite and inadequate energy.  Id.  She described her current mood as a five out of ten, with one being no depression and ten being worst depression.  Dr. McKay found this "slightly exaggerated given her presentation (i.e. fairly cheerful mood and anxious effect) and the content of the conversation." AR 249.  Ms. Groneman rated her anxiety as a four on the same scale which Dr. McKay stated could be accurate.  Id.

Dr. McKay stated that Ms. Groneman's long term memory appeared average as measured on the date of the examination.  AR 249.  Her delayed recall and immediate recall were also average.  Id.  Her attention and concentration were good as measured that day and she experienced no sensitivity to auditory or visual distractions, or disturbance of pace or persistence.  Id.  Her fund of general information was mediocre.  She correctly stated the number of days and weeks in the year, but was unable to state the direction from which the sun rises or on what continent Brazil is located.  Her vocabulary was average.  Her social knowledge and judgment was poor.  Dr. McKay "observed no reason to suspect that [Ms. Groneman] was not putting forth her best effort during the mental examination." AR 250.  She appeared, however, "to exaggerate the severity of her depression, which could call into question the severity of her other symptoms and limitations and might represent to a very mild degree an attempt to inflate pathology to obtain disability benefits." AR 250.  Ms. Groneman's description of her daily activities was consistent with her Function Report and her subsequent testimony at the hearing.  AR 250.

Under "Functional Assessment," Dr. McKay stated that Ms. Groneman can understand, remember and carry out, and sustain attention and concentration for, some complex tasks and most detailed and simple tasks.  She exhibited average to good long-term memory, delayed and immediate recall, concentration, vocabulary and ability to abstract.  Dr. McKay noted that Ms. Groneman's statements that it would be hard for her to work because of problems with concentration, memory, difficulty getting up in the morning or lack of energy were inconsistent

11

1    with her performance on the mental status examination.  AR 250.

2         Dr. McKay recited Ms. Groneman's reports of various symptoms and problems related to

3    her mania and depression.  He noted that she appeared to read some of her symptoms from a

4    checklist.  He stated: "Overall, Janine seemed able to respond appropriately to work pressure in a

5    work setting and work in coordination with and in close proximity to others without conflict or

6    distraction, but she conveyed that her depression and mania have caused moderate to marked

7    interpersonal problems (i.e. manic episodes where she becomes irritable, moves away, changes

8    addresses and spends money recklessly) that could interfere with employment."  AR 251.

9         Dr. McKay's diagnosis at Axis I was Bipolar Disorder, Not Otherwise Specified.  At Axis

10   V, he gave Ms. Groneman a GAF score of 65, comprised of psychological factors only, which

11   could change dramatically when she experiences manic or depressive episodes.  AR 251.  He stated

12   that Ms. Groneman's prognosis appeared fair and depends on her life choices and engagement in

13   sustained mental health treatment.  He further stated: "She appears to retain sufficient cognitive

14   resources to sustain employment for a 12-month period, but her mania has periodically reduced her

15   emotional resources to a moderate to marked degree in the past."  AR 251-252.

16        **(g)  Susan Kotler, Ph.D.**  Agency psychologist Susan Kotler conducted a records review

17   on May 13, 2010 in regard to Ms. Groneman's request for reconsideration of the denial of her

18   claim.  AR 311.  Dr. Kotler noted that Dr. McKay's October 22, 2009 report "indicated cognitive

19   capability at all levels of task complexity w/no limitations in CPP and no limitations in

20   interpersonal functioning (GAF 65).  At recon, claimant is not alleging any changes in mental

21   conditions but continued mental sx that were addressed at the initial determination.  Updated

22   psychiatric MER through 3-3-10 describes no disturbances on MSE and moderate progress toward

23   tx goals.  As such, the evidence at recon does not indicate that further development is warranted or

24   that the initial determination should be revised, affirmed as previously written with not severe

25   mental impairment."  AR 311.

26        **(h)  George Nickles, M.D.**  Agency psychiatrist Dr. George Nickles, conducted a records

27   review on May 12, 2010 and concluded that MER submitted does not support the presence of a

28   severe MDI.  AR 310.

**(i)  Ron Cummings, MFT, LADC.**  The record also contains psychotherapy notes from Therapist Ron Cummings from June 2007 to March 3, 2010 which the Court does not summarize here.  AR 312-323.

### 3.      Hearing Testimony Before the ALJ.

Janine Groneman testified at a hearing before the ALJ on April 21, 2011.  The ALJ also obtained testimony from medical expert William Debolt, M.D. and vocational expert Jack Dymond.  AR 44-73.

The ALJ asked Ms. Groneman why she left her employment.  She responded: "Because at the time I was having a lot of vomiting and dry heaves.  I didn't know what was wrong with me.  I kept calling in sick all the time, so I finally saw a stomach gastro doctor who did an MRI on my head and found my brain tumor."  AR 47.  She testified that she had not performed any type of work since September 2007.  AR 47-48.

Ms. Groneman stated that she has a driver's license and has not been advised by any doctor that she should not drive  The furthest she has driven is from her home to Boulder City, Nevada which takes about 20 minutes.  She rode as a passenger in an automobile trip to Seattle, Washington and indicated that she could ride for approximately three hours until she needed a stop because of low back pain.  AR 48-49.  Her husband drives her to medical appointments.  AR 52. Ms. Groneman testified she is "barely" able to do cooking.  She generally cooks only frozen meals. AR 50.  She goes grocery shopping with her husband.  Id.  Ms. Groneman cares for her small dogs, but does not take them for walks.  AR 50-51.  She uses a computer probably once a day for about 15-20 minutes to read Facebook.  AR 51-52.  She occupies most of her time watching television. She stated that she has difficulty understanding and concentrating on the television shows.  AR 52, 55.  As far as outside social events, she stated that she attended a 4th of July fireworks display.  AR 52-53.  Ms. Groneman testified that she has fourteen grandchildren.  She indicated that she visits with them, but has not attended any school or other events involving her grandchildren.  AR 54-55.

Ms. Groneman's counsel asked her about her problems with concentration.  She stated: "Well, it's been like this ever since they took the tumor out.  My memory has gone really bad.  I don't remember things.  I'm very forgetful and it's hard for me to concentrate."  AR 55.  She stated

1   that she puts appointments on the calendar so that she does not forget them and she relies on her

2   husband to keep track of things such as food in the oven.  Id.  Ms. Groneman also stated that she

3   has problems with her temper.  She stated: "[I]f I disagree with what's going on, I'll get irate and

4   throw a fit."  This occurs mostly with family members.  She stated that this also occurred prior to

5   the surgery, but was not as bad.  AR 56.

6          Ms. Groneman testified that her sleep pattern goes up and down.  She takes a sleeping pill

7   which works sometimes.  She stated: "Sometimes I wake up with excessive grogginess.  A lot of

8   times, yeah, I don't sleep."  She stated that she has gone as long as four days without sleeping.

9   Other times, she will sleep for as long as two or three days.  AR 56.  She clarified this statement by

10  stating that she has extended periods of grogginess in which she is in and out of sleep.  AR 56-57.

11  As to why she believes she cannot work a full time job, Ms. Groneman testified:  "Because mostly

12  because of the brain tumor, because since my brain tumor I have no energy.  I can't concentrate.  I

13  can't remember things.  Sometimes because of my nauseous stomach that I have."  AR 57.

14         Ms. Groneman testified that she experiences nausea on an every other day or every two day

15  basis.  The nausea lasts throughout the day.  She does not vomit.  AR 57-58.  Her physician

16  prescribed "Phenergan" for the nausea, which she states sometimes helps.  AR 58.  Ms. Groneman

17  testified that she had seen several doctors for the nausea, but they did not know what was wrong

18  with her.  She testified that Dr. Ross, a gastroenterologist at UCLA, told her "it had to do with my

19  brain tumor that I have.  He said that the nerve endings are still pushing on the part of my brain that

20  controls nausea."  AR 58.

21         The ALJ asked the medical expert, Dr. William Debolt, "what medical diagnoses apply to

22  Ms. Groneman from April of 2007 until now?"  Dr. Debolt responded that Ms. Groneman has

23  residuals from the removal of an angioma tumor and that one month following the surgery, normal

24  neurological findings were present.  AR 59.  Dr. Debolt stated that Ms. Groneman's current

25  abdominal pains, difficulty digesting and nausea were not caused by the brain tumor.   He indicated

26  that Ms. Groneman's physicians had not diagnosed a cause for these symptoms.  AR 59-60.   Dr.

27  Debolt testified that there was no medical indication that Ms. Groneman had any remaining tumor

28  that was causing any of her symptoms.  He also testified that the tumor Ms. Groneman had is not

14

1    the type that should reoccur.  AR 61.  Dr. Debolt testified that Ms. Groneman did not have any

2    limitations as a result of the brain tumor or surgery.  AR 62.  He did not believe the brain tumor or

3    the surgery affected Ms. Groneman's ability to concentrate, or her long-term or short-term memory.

4    AR 62-63.  He also testified that Ms. Groneman's alternate episodes of drowsiness and

5    hyperactivity were not caused by the brain tumor or the surgery to remove it.  AR 63.

6         The vocational expert, Jack Dymond, testified that Ms. Groneman's past work as a loan

7    funding associate, medical biller, medical records associate, office manager for a chiropractor, and

8    patient coordinator were all classified as sedentary work.  AR 70.  The ALJ posed the following

9    question to Mr. Dymond:

10                I'd like you to consider a hypothetical individual, Mr. Dymond, who
            can lift or carry occasionally 25 pounds, frequently ten pounds, is
11             limited to simple repetitive tasks, can be anticipated to miss two days
            of work a month on an unscheduled basis.  Could that hypothetical
12             person perform any employments that claimant did from 1996 until
            present at substantial gainful activity levels?
13

14        AR 71.

15        Mr. Dymond responded no because the jobs that Ms. Groneman had did not involve simple

16   repetitive tasks and secondly, "she, or any other employee, would not be able to have that much

17   time off that is unscheduled."  AR 71.  The ALJ then asked whether a hypothetical claimant with

18   the lifting and carrying limitations previously stated, but without the limitation for unscheduled

19   time off, could perform Ms. Groneman's past work.  Mr. Dymond responded that the person could.

20   AR 72.

21        **C.    Administrative Law Judge's June 27, 2011 Decision.**

22        The ALJ applied the five-step sequential evaluation process established by the Social

23   Security Administration in determining whether Plaintiff was disabled.  AR 24-25.  The ALJ found

24   that Plaintiff met the insured status requirements of the Social Security Act through December 31,

25   2012.  He also found that she had not engaged in substantial gainful activity since April 27, 2007,

26   the alleged onset date.  He found that the employment that Plaintiff engaged in after that date until

27   September 2007 did not rise to the level of substantial gainful activity.  AR 25.

28   . . .

15

At step two, the ALJ found that Plaintiff had the following severe impairments: Status post brain tumor (20 CFR 404.1520(c).  He stated that this impairment "significantly limits the claimant's ability to perform work-related activities and is therefore severe within the meaning of the regulations."  AR 25.  The ALJ stated, however, that Plaintiff's medically determinable impairment of Affective/Anxiety Disorders, insomnia and gastroparesis did not cause more than minimal limitation in her ability to perform basic mental work activities and are therefore nonsevere.  Id.  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).  In support of this finding, the ALJ relied on Dr. Debolt's hearing testimony.  AR 26.

At step four, the ALJ found that Plaintiff had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b).  AR 26.  The ALJ stated that in making this determination, he was required to follow a two-step process in which he must first determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms.  Id.  Second, once an underlying physical or mental impairment has been shown, then the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit her functioning.

The  ALJ then stated:

> The claimant alleged an inability to work due to bipolar disorder and brain tumor.  In a disability report prepared at the request of the State Agency, she indicated that the medications that she takes for bipolar disorder make it impossible for her to work.  She lacks sleep, is unable to concentrate, has loss of memory or excessive sleepiness. At the hearing, the claimant testified that her memory has been really bad since the tumor was removed.  She gets irritated with family members since the surgery.  She testified that she can't work because she gets nauseous every other day or two.

AR 26 (citations to record omitted).

The ALJ stated that the objective medical evidence supports a finding that claimant's impairment-related limitations would not preclude her from performing the range of light work outlined in the residual functional capacity.

16

1    The ALJ then summarized the evidence relating to Plaintiff's September 2007 emergency

2    room visits and hospitalization during which the meningioma was diagnosed and surgically

3    removed.  AR 26-27.  The ALJ noted that while the Plaintiff complained of being tired and having

4    some nausea post-surgery, her neurological examination was nonfocal, follow-up MRI studies

5    showed no residual tumor and subsequent studies showed no recurrence of the tumor.  Id.

6    The ALJ next noted that Plaintiff has been followed by Dr. Bist for bipolar disorder and has

7    been prescribed medication including Limictal, Restorial, and Geodon.  On January 12, 2009, Dr.

8    Bist diagnosed bipolar disorder by history and assigned a GAF of 65, denoting mild symptoms.

9    Ongoing progress notes from 2009 through 2010 reflected claimant doing well on medications.

10   Her mood was noted to be stable, and she was sleeping okay.  AR 27.

11   The ALJ stated that after careful consideration of the evidence, he found that Plaintiff's

12   medically determinable impairments could reasonably be expected to cause the alleged symptoms.

13   He found, however, that the Plaintiff's statements concerning the intensity, persistence and limiting

14   effects of her symptoms were not credible to the extent they were inconsistent with his residual

15   functional capacity assessment.  AR 27.  In support of this statement, the ALJ again cited Dr. Bist's

16   treatment notes which consistently indicated that Plaintiff's mood was stable.  The ALJ gave some

17   weight to the opinion of Dr. McKay, noting that "[h]e gives contradictory descriptions of the

18   limitations based on claimant's statements only without review of Dr. Bist's record.  He assigned a

19   GAF of 65, denoting mild symptoms."  AR 27.  The ALJ gave little weight to Dr. DiOrio's opinion

20   because it was conclusory, without description of limitations, and commented on an issue reserved

21   for the Commissioner.  He also found that Dr. DiOrio's opinion was not supported by treatment

22   notes or clinical studies and was not consistent with the treatment notes of Dr. Bist.  Id.  The ALJ

23   also gave little weight to the opinions of the State Agency physician, Dr. Nickles and the State

24   Agency psychologist, Dr. Kotler.  AR 27.  He accorded full weight to Dr. Debolt's opinion

25   regarding Plaintiff's neurological limitations.  The ALJ also stated that he considered the

26   statements of Marvin Groneman, but found them less than credible based on the other evidence.

27   AR 28.

28   . . .

17

Based on his assessment of Plaintiff's residual functional capacity, the ALJ found that she was capable of performing her past work as a funding associate, medical biller, office manager, or patient coordinator.  He therefore concluded that she was not disabled from April 27, 2007 through the date of the decision.  AR 28.

**DISCUSSION**

**I.      Standard of Review.**

A federal court's review of an ALJ's decision is limited to determining only (1) whether the ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper legal standards.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991).  The Ninth Circuit has defined substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal. 2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001).  The Court must look to the record as a whole and consider both adverse and supporting evidence.  *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).  Where the factual findings of the Commissioner of Social Security are supported by substantial evidence, the District Court must accept them as conclusive.  42 U.S.C. § 405(g).  Hence, where the evidence may be open to more than one rational interpretation, the Court is required to uphold the decision. *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)).  *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  The court may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision.  *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the findings.  *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981), citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir. 1974).  In order to enable the court to properly determine whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a

1    statement of subordinate factual foundations on which the ultimate factual conclusions are based."
2    *Lewin*, 654 F.2d at 635.
3         In reviewing the administrative decision, the District Court has the power to enter "a
4    judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security,
5    with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In the alternative, the
6    District Court "may at any time order additional evidence to be taken before the Commissioner of
7    Social Security, but only upon a showing that there is new evidence which is material and that there
8    is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  *Id.*

9              **II.    Disability Evaluation Process.**

10        To qualify for disability benefits under the Social Security Act, a claimant must show that:
11   (a) he/she suffers from a medically determinable physical or mental impairment that can be
12   expected to result in death or that has lasted or can be expected to last for a continuous period of
13   not less that twelve months; and (b) the impairment renders the claimant incapable of performing
14   the work that the claimant previously performed and incapable of performing any other substantial
15   gainful employment that exists in the national economy.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th
16   Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A).  The claimant has the initial burden of proving
17   disability.  *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996).
18   If the claimant establishes an inability to perform his or her prior work, the burden shifts to the
19   Commissioner to show that the claimant can perform a significant number of other jobs that exist
20   in the national economy.  *Hoopai v. Astrue*, 499 F.3d 1071, 1074-75 (9th Cir. 2007).

21        Social Security disability claims are evaluated under a five-step sequential evaluation
22   procedure.  *See* 20 C.F.R. § 404.1520(a)-(f).  *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir.
23   2001).  The claimant carries the burden with respect to steps one through four.  *Tackett v. Apfel*,
24   180 F.3d 1094, 1098 (9th Cir. 1999).  If a claimant is found to be disabled, or not disabled, at any
25   point during the process, then no further assessment is necessary.  20 C.F.R. § 404.1520(a).  Under
26   the first step, the Secretary determines whether a claimant is currently engaged in substantial
27   gainful activity.  *Id.* § 416.920(b).  If so, the claimant is not considered disabled.  *Id.* § 404.1520(b).
28   Second, the Secretary determines whether the claimant's impairment is severe.  *Id.* § 416.920(c).  If

1   the impairment is not severe, the claimant is not considered disabled.  *Id.* § 404.152(c).  Third, the

2   claimant's impairment is compared to the "List of Impairments" found at 20 C.F.R. § 404, Subpt.

3   P, App. 1.  The claimant will be found disabled if the claimant's impairment meets or equals a

4   listed impairment.  *Id.* § 404.1520(d).  If a listed impairment is not met or equaled, the fourth

5   inquiry is whether the claimant can perform past relevant work.  *Id*. § 416.920(e).  If the claimant

6   can engage in past relevant work, then no disability exists.  *Id.* § 404.1520(e).  If the claimant

7   cannot perform past relevant work, the Secretary has the burden of proof at the fifth and final step

8   to demonstrate that the claimant is able to perform other kinds of work.  *Id.* § 404.1520(f).  If the

9   Secretary cannot meet his or her burden, the claimant is entitled to disability benefits.  *Id.* §

10  404.1520(a).

11  **III.    Whether the ALJ Erred at Steps Two, Four or Five of the Sequential
             Evaluation Procedure.**

12

13       The ALJ's findings at steps two and four of the sequential process are somewhat at odds

14  with the evidence in that he found that Plaintiff's "post-surgical status" constituted a severe mental

15  impairment, but that her bipolar disorder did not.  Ms. Groneman initially asserted that she was

16  disabled as a result of bipolar disorder and the medication prescribed to treat that disorder.  After

17  her disability claim was denied, Plaintiff retained counsel and shifted her disability claim to the

18  effects of her bipolar disorder and her brain tumor surgery.  At the hearing before the ALJ, Plaintiff

19  attributed her inability to concentrate, loss of memory, irritability, insomnia and nausea to the brain

20  tumor and surgery.  Although it may be Plaintiff's sincere belief that her symptoms were caused or

21  made worse by the brain tumor or surgery, the medical evidence does not support this belief, with

22  the possible exception of her post-surgery nausea.

23       According to the medical reports of the surgeon, Dr. Forage, the meningioma tumor was

24  successfully excised.  Post-surgically, there was no residual tumor and only a small amount of fluid

25  remained at the operative site.  There was no evidence of any recurrence of the tumor.  Dr. Debolt's

26  hearing testimony that the brain tumor and surgery to remove it did not affect the part of the brain

27  that controls understanding, concentration or long-term or short-term memory is not contradicted

28  by any medical evidence in the record.  Likewise, his opinion that the tumor or surgery did not

cause Plaintiff's abdominal pain, difficulty digesting or nausea is essentially uncontradicted by any other medical evidence in the record.[2]  His testimony that Plaintiff was neurologically stable one month after the surgery is also uncontradicted.  AR 61.

The severity inquiry at step two of the sequential process is "a de minimis screening device to dispose of groundless claims."  *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).  An impairment can be found "not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work."  *Id.  See also Webb v. Barnhart*, 433 F.3d 683, 686-87 (9th Cir. 2005).  Even under this low evidentiary threshold, the ALJ's finding that Plaintiff had a severe impairment related to her "status post brain tumor" is questionable given the lack of medical evidence that Plaintiff's post-surgery symptoms were related to the meningioma or the surgery.  Conversely, the ALJ found at step two that Plaintiff's medically determinable mental impairment of "Affective/Anxiety Disorders, insomnia and gastroparesis" did not cause more than minimal limitation on her ability to perform basic mental work activities and were therefore not severe.  AR 25.  This finding also appears questionable in light of the low threshold for determining that an impairment is severe at step two and the medical evidence and testimony regarding Plaintiff's bipolar disorder.

The ALJ is required to consider all impairments, including those found not to be severe, in determining whether a claimant is disabled.  42 U.S.C. § 423(d)(2)(B); *Celaya v. Halter*, 332 F.2d 1177, 1181-82 (9th Cir. 2003); *Parsons v. Colvin*, 2013 WL 5310265, at *1 (D.Or. 2013).  Even assuming that the ALJ errs in failing to list an impairment as severe at step two, the error is harmless if the ALJ properly considers the impairment, along with all other impairments, at step four of the sequential process.  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  *See also Jerome v. Colvin*, --- Fed Appx. ----, 2013 WL 5568220 (C.A.9 (Mont.), 2013), *Parsons v. Colvin*, 2013 WL 5310265, at *1, and *Ivory v. Colvin*, 2013 WL 618573, at *5 (E.D.Cal. 2013).

_____

[2] Dr. Roth stated that Plaintiff's nausea could be due to a central nervous system condition with heightened sensitivity of the brain to any form of stimuli inducing nausea, or a component of emotional issues.  He did not, however, provide a definitive opinion as to the cause of the nausea or attribute it to the brain tumor or brain surgery.

21

At step four of the sequential process, the ALJ evaluated Plaintiff's condition following her surgery on September 17, 2007 which indicated that she had made a full recovery from the surgery and had no subsequent recurrence of the tumor.  AR 26-27.  The ALJ then evaluated Plaintiff's symptoms and treatment for bipolar disorder.  He noted that Plaintiff was treated by Dr. Bist for bipolar disorder and had been prescribed medication.  The ALJ stated that "[o]n January 12, 2009, Dr. Bist diagnosed bipolar disorder by history and assigned a GAF of 65 denoting mild symptoms. He also noted that Dr. McKay assigned Plaintiff a GAF score of 65 when he examined her on October 22, 2009.  AR 27, 251.[3]  The ALJ also found that Dr. Bist's notes indicated ongoing progress from 2009 through 2010 which reflected that Plaintiff was doing well on medications; her mood was stable and she was sleeping okay.  AR 27.  The ALJ's characterization of Dr. Bist's records is essentially accurate.  Dr. Bist's notes did state, however,  that Plaintiff experienced

---

[3] "GAF scores 'are used by mental health clinicians and doctors to rate the social, occupational and psychological functioning of adults.'"  *Sweeney v. Commissioner of Social Sec.*, 847 F.Supp.2d 797, 802 (W.D.Pa. 2012), citing *Irizarry v. Barnhart*, 233 Fed.Appx. 189, 190 n. 1 (3d Cir. 2007).  "'The GAF scale, designed by the American Psychiatric Association, ranges from 1 to 100, with a score of 1 being the lowest and 100 being the highest.'" *Id.*, citing *West v. Astrue,* 2010 WL 1659712, at *4 (E.D.Pa. Apr. 26, 2010).  "An individual with a GAF score of 60 may have '[m]oderate symptoms' or 'moderate difficulty in social, occupational, or school functioning;' of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)' or 'impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);' of 40 may have '[s]ome impairment in reality testing or communication' or 'major impairment in several areas, such as work or school, family relations, judgment, thinking or mood'. . . ." *Gallagher v. Astrue*, 2012 WL 2344455, at *10 n. 3 (W.D.Pa. 2012), citing *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM–IV–TR) 34 (4th ed.2000); *Bracciodieta–Nelson,* 782 F.Supp.2d 152, 157 (W.D.Pa. 2011)."

Despite its usefulness as a tool for psychological assessment, courts in the Ninth Circuit hold that a GAF score is not determinative of mental disability or limitation for social security purposes, and an ALJ is not bound to consider it in determining whether a claimant is disabled by a mental impairment.  *Hammons v. Colvin*, 2013 WL 5786092, at *10 (W.D.Wash. 2013), citing *McFarland v. Astrue,* 288 Fed. Appx. 357, 359 (9th Cir.2008) and *Orellana v. Astrue,* 2008 WL 398834, at *9 (E.D.Cal. Feb.12, 2008).  *See also Mann v. Astrue*, 2009 WL 2246350, at *1 (C.D.Cal. 2009) and *Thomas v. Astrue*, 2009 WL 141488, at *6 (C.D.Cal. 2009).  In this case, the ALJ considered Plaintiff's GAF scores of 65 to denote mild symptoms.

symptoms of anxiety, fear or apprehension and sleeping problems or insomnia in March 2010 and again on March 2, 2011.  Otherwise, Dr. Bist continuously noted that Plaintiff made moderate or significant progress toward the treatment goals.

Although Dr. Bist did not provide a formal mental functional assessment of the Plaintiff, the ALJ appeared to give substantial weight to his treatment records.  The ALJ gave "some weight" to the opinion of Dr. McKay whose mental functional assessment indicated that Plaintiff had the mental and cognitive ability to work an eight hour day, forty hour a week job during a twelve month period, particularly if she continued to engage in mental health treatment.  Dr. McKay noted, however, that Plaintiff's ability to work might be impaired by episodes of mania.  The ALJ discounted Dr. McKay's report to the extent it was based on Plaintiff's description of the severity of her symptoms and was contrary to Dr. Bist's notes, which Dr. McKay had not reviewed.  The ALJ accorded little weight to the opinion of Dr. DiOrio because it was conclusory, without description of limitations and commented on an issue reserved for the Commissioner, i.e. whether Plaintiff was disabled from working.[4]  The ALJ also gave little weight to the opinions of the state agency psychologist.  That opinion, however, supported a finding that Plaintiff was not disabled.

"Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's."  *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001).  If the treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," it should be afforded more weight.  20 CFR 416.927(d)(2).  The ALJ need not accept an opinion of a treating physician, however, if it is conclusory and not supported by clinical findings.  *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).  *See also Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("The ALJ need not

_____

[4] Although not mentioned by the ALJ, Dr. DiOrio treated Plaintiff from June 2006 to approximately June 2007.  During that period Plaintiff was working.  There is no indication that Dr. DiOrio examined Plaintiff or reviewed her medical or mental health treatment records for the period after her recovery from the September, 2007 brain tumor surgery.

accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.")  If the treating physician's opinion is contradicted by another physician, then the treating physician's opinion can only be rejected by the Secretary for specific and legitimate reasons, supported by substantial evidence in the record for so doing.  *Lester v. Charter*, 81 F.3d 821, 831 (9th Cir. 1996).

The ALJ's decision to accord greater weight to Dr. Bist's treatment records than to any contradictory findings by Dr. McKay regarding the severity of Plaintiff's symptoms was reasonably justified on the grounds that Dr. Bist had examined and treated Plaintiff on a fairly regular basis for a period in excess of two years, whereas Dr. McKay evaluated her on only one occasion.  On the other hand, Dr. Bist did not provide a detailed narrative evaluation of Plaintiff's mental functioning and an assessment of Plaintiff's ability to perform work related tasks as did Dr. McKay.  Overall, Dr. McKay's evaluation and findings were consistent with Dr. Bist's treatment records and support a finding that Plaintiff has the mental and cognitive ability to work.   The ALJ also set forth reasonable and valid reasons for according little weight to the opinion of Dr. DiOrio, which was conclusory and not supported by clinical findings.  Based on the medical records alone, a finding that Plaintiff's symptoms were not so severe as to disable her from work would be justified.

Plaintiff primarily attacks the ALJ's decision on the grounds that he failed to provide sufficient reasons for finding that Plaintiff's statements and testimony regarding the severity of her symptoms were not credible.  Plaintiff argues that the ALJ's credibility analysis and findings do not satisfy the standard under Ninth Circuit case law.  In *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (2009), the court states that under Ninth Circuit case law,

> [w]ithout affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing.  If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive.  The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints.  In this regard, questions of credibility and resolutions of conflicts in the testimony are functions solely of the Secretary.
>
> *Morgan v. Comm'r of Soc. Sec. Admin.,* 169 F. 3d 595, 599 ( 9th Cir. 1999) (citations omitted).

*Burch v. Barnhart,* 400 F.3d 676, 680 (9th Cir. 2005) further states:

> In evaluating the credibility of pain testimony after a claimant produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain. *See Bunnell v. Sullivan,* 947 F.2d 341, 345 (9th Cir.1991). The rationale for this restriction is that pain testimony may establish greater limitations than can medical evidence alone. *See* SSR 96–7p (1996). In determining credibility, an ALJ may engage in ordinary techniques of credibility evaluation, such as considering claimant's reputation for truthfulness and inconsistencies in claimant's testimony. *See Tonapetyan v. Halter,* 242 F.3d 1144, 1148 (9th Cir.2001). Additionally, Social Security Ruling 88–13 lists a number of factors the ALJ may consider:
>
> > 1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain; 2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions); 3. Type, dosage, effectiveness, and adverse side-effects of any pain medication; 4. Treatment, other than medication, for relief of pain; 5. Functional restrictions; and 6. The claimant's daily activities.
>
> *Bunnell,* 947 F.2d at 346 (quoting SSR 88–13 (1988)) (superceded by SSR 95–5p (1995)); *see also Smolen v. Chater,* 80 F.3d 1273, 1284 (9th Cir. 1996).
>
> Unless there is affirmative evidence showing that the claimant is malingering, the ALJ's reasons for rejecting pain testimony must be clear and convincing. *See Lester v. Chater,* 81 F.3d 821, 834 (9th Cir.1995). The ALJ must specify what testimony is not credible and identify the evidence that undermines the claimant's complaints —"[g]eneral findings are insufficient." *Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir. 1998) (internal quotation marks omitted).

In *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 884-85 (9th Cir. 2006), the ALJ found that the claimant's testimony was "not consistent with or supported by the overall medical evidence of record." The court stated that this finding

> [] is exactly the type we have previously recognized the regulations prohibit. *See* SSR 96–7p, 1996 WL 374186, at *1; *Light,* 119 F.3d at 792 ("In this case, the ALJ disbelieved Light because no objective medical evidence supported Light's testimony regarding the severity of subjective symptoms from which he suffers, particularly pain. An ALJ may not discredit a claimant's subjective testimony on that basis. To find the claimant not credible, the ALJ must rely either on reasons unrelated to the subjective testimony (e.g., reputation for dishonesty), on conflicts between his testimony and his own conduct, or on internal contradictions in that testimony.").

. . .

25

> In addition, we note that the ALJ did not provide a "narrative discussion" that "contain[s] specific reasons for the finding ..., supported by the evidence in the case record"; nor was his brief notation "sufficiently specific to make clear ... the weight the adjudicator gave to the individual's statements and the reasons for that weight," as he is required to do. *See* SSR 96–7p, 1996 WL 374186, *2; SSR 96–8p, 1996 WL 374184, at *7.  So, even if the ALJ had given facially legitimate reasons for his partial adverse credibility finding, the complete lack of meaningful explanation gives this court nothing with which to assess its legitimacy.  While an ALJ may certainly find testimony not credible and disregard it as an "unsupported, self-serving statement," we cannot affirm such a determination unless it is supported by specific findings and reasoning. *See Flaten,* 44 F.3d at 1464.

In this case, the ALJ stated that after careful consideration of the evidence, he found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms.  He found, however, that the Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to they extent they were inconsistent with his residual functional capacity assessment.  AR 27.   In support of this statement, the ALJ cited the findings in the medical records, relying in particular on Dr. Bist's treatment notes.  The ALJ, however, did not analyze the credibility of Plaintiff's statements and testimony in accordance with the standards set forth in the above cases.

As the Seventh Circuit stated in *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008), "a person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heaving drugs, is likely to have better days and worse days."  In this case, the Plaintiff was prescribed a variety of drugs to deal with her symptoms of mania, depression, insomnia, and nausea.  She reported and testified that her bipolar disorder and/or medications caused her continuous problems with concentration, memory, and alternate insomnia or excessive sleeping and grogginess.  She also complained of recurring nausea.  Because of the severity of her symptoms, Plaintiff claimed that she was no longer able to work.  It was incumbent on the ALJ to evaluate the credibility of Plaintiff's statements and testimony regarding the severity of her symptoms in accordance with the foregoing case law.  He could not discredit her statements and testimony simply on the grounds that they were not consistent with the indications in the medical records or reports.  The Court is therefore required to reject the ALJ's credibility determination and

26

reverse his finding that Plaintiff's bipolar disorder symptoms were not as severe as she described.

The ALJ asked the vocational expert whether a hypothetical person who can be anticipated to miss two days of work a month on an unscheduled basis could perform any of the sedentary employments that Plaintiff did at substantial gainful activity levels.  The vocational expert responded no, first, because the jobs that Plaintiff had did not involve simple repetitive tasks and secondly, "she, or any other employee, would not be able to have that much time off that is unscheduled."  AR 71.  Given this testimony, it appears that if Plaintiff's testimony is credited as true, she would not be able to perform her past work or other occupations.

**IV.    Whether This Case Should Be Remanded for An Award of Benefits or for Further Administrative Proceedings to Determine Whether Plaintiff is Disabled.**

There is a split of authority in the Ninth Circuit in regard to whether an application for social security disability benefits should be remanded for an award of benefits or further administrative proceedings when the court determines that the ALJ failed to provide legally sufficient reasons for rejecting the claimant's testimony.

In *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004), the court stated as follows:

> Remand for further administrative proceedings is appropriate if enhancement of the record would be useful. *See Harman*, 211 F.3d at 1178.  Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits. *See Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996); *Varney v. Secretary of Health and Human Services*, 859 F.2d 1396, 1399 (9th Cir.1988).  More specifically, the district court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.  *Harman*, 211 F.3d at 1178; *see also McCartey v. Massanari*, 298 F.3d 1072, 1076-77 (9th Cir. 2002); *Smolen*, 80 F.3d at 12920.
>
> Where the *Harman* test is met, we will not remand solely to allow the ALJ to make specific findings regarding excessive pain testimony. Rather, we take the relevant testimony to be established as true and remand for an award of benefits. *Varney*, 859 F.2d at 1401; *see also Reddick v. Chater*, 157 F.3d 715, 728 (9th Cir. 1998) (quoting *Varney*); *Lester*, 81 F.3d at 834 (same); *Swenson v. Sullivan*, 876 F.2d 683, 689 (9th Cir.1989) (same); *but cf. Connett v. Barnhart*, 340

27

1    F.3d 871, 876 (9th Cir. 2003) (holding that the court has flexibility in
     crediting petitioner's testimony if substantial questions remain as to
2    her credibility and other issues must be resolved before a
     determination of disability can be made).
3

4        The court in *Benecke* held the ALJ's rejection of the claimant's testimony regarding the

5    severity of her fibromyalgia symptoms and the opinions of her treating physicians regarding her

6    physical limitations was in error.  Because the vocational expert testimony established that the

7    claimant was unable to perform a sedentary job based on her credited symptoms and physical

8    limitations, the court held that remand for administrative proceedings would serve no useful

9    purpose and was unwarranted.  *Id.* 379 F.3d at 596.

10       In *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003), however, the court stated as

11   follows:

12           . . . [W]e are not convinced that the "crediting as true" doctrine is
             mandatory in the Ninth Circuit.  Despite the seemingly compulsory
13           language in *McCartey* and *Swenson,* there are other Ninth Circuit
             cases in which we have remanded solely to allow an ALJ to make
14           specific credibility findings.  In *Dodrill,* for example, our court
             specifically remanded for the ALJ to "articulat[e] specific findings
15           for rejecting [the claimant's] pain testimony and the testimony of lay
             witnesses." 12 F.3d at 919.  In *Nguyen v. Chater*, where the ALJ
16           failed to consider the claimant's testimony with regard to his asthma,
             our court remanded with the specific proviso that "[i]t is not our
17           intent ... to preclude the ALJ from reopening the hearing to receive
             additional evidence," including, presumably, evidence regarding the
18           claimant's credibility. 100 F.3d 1462, 1466-67 (9th Cir.1996).  *See
             also Byrnes v. Shalala,* 60 F.3d 639, 642 (9th Cir.1995) ("We
19           therefore remand this case to the ALJ for further findings evaluating
             the credibility of [the claimant's] subjective complaints....").
20

21       An arguable distinction between *Benecke* and *Connett* is that in *Benecke,* there was no basis

22   in the record to support the ALJ's rejection of the claimant's testimony regarding the severity of her

23   fibromyalgia symptoms, whereas in *Connett* the record contained evidence that would have

24   supported the ALJ's decision if he had cited that evidence in support of his decision.  In any event,

25   the conflict in the Ninth Circuit case law on this issue has not yet been resolved.  *See Vasquez v.*

26   *Astrue*, 572 F.3d 586, 593 (9th Cir. 2009).

27       In *Esposito v. Astrue*, 2012 WL 1027601, *8 (E.D.Cal. 2012), the district court commented

28   on the Ninth Circuit conflict as follows:

District courts are thus commanded by the *Benecke* line of cases to remand for payment of benefits if the three-part test discussed above is met, but simultaneously instructed by *Connett* that they need not remand for payment of benefits under the same circumstances. As the *Benecke* line of authority appears to require this court to remand for payment of benefits if the precedent conditions are met, and the *Connett* line of cases merely permits, but does not require, this court to remand for further proceedings in the same circumstances, this court seems bound to apply the *Benecke* line of cases. Indeed, *Connett* does not explain how this court should decide whether to apply the credit-as-true rule, but merely suggests that we have flexibility in choosing which claimants receive benefits on remand when the same precedent conditions are met. Such an approach invites arbitrary decision-making and impermissible re-weighing of the medical evidence by this court. Thus, until the Ninth Circuit resolves this issue en banc, this court will follow the *Benecke* test.

See also *Wilson v. Astrue*, 2011 WL 609801, *11 (D.Or. 2011) (noting that decisions after *Connett* decline to endorse that case's flexible approach and instead frame the credit-as-true rule as encouraged if not altogether mandatory).

Given the testimony of the vocational expert in this case, a conclusion that Plaintiff is disabled from performing regular work appears required if her statements and testimony regarding the severity of her symptoms are credited as true. The Court further notes that Plaintiff was 58 years old at the time of the hearing and administrative decision in this case. A further remand for an adequate credibility determination, which should have made when the ALJ issued his decision in June 2011, would be unfair under these circumstances

## CONCLUSION

The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms. He improperly rejected her statements and testimony regarding the severity of her symptoms because they were not consistent with the medical records or opinions and failed to provide an evaluation of Plaintiff's credibility in accordance with the applicable standards. Plaintiff's statements and testimony regarding the severity of her symptoms should therefore be credited as true. The vocational expert's testimony supports a finding that Plaintiff is unable to perform substantial gainful employment based on her alleged symptoms. Accordingly,

. . .

29

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Reversal and Remand (#20) be **granted** and that Defendant's Cross-Motion to Affirm and Opposition to Plaintiff's Motion for Reversal (#21) be **denied.**

**IT IS FURTHER RECOMMENDED** that this matter be remanded to the Social Security Administration for the payment of disability benefits to the Plaintiff.  Plaintiff should also be ordered to pay the filing fees in this matter upon the receipt of the payment of past due benefits.

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 13th day of December, 2013.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge

30